GRIMME *v.* GENERAL COUNCIL OF THE FRATERNAL AID ASSOCIATION.

1. EVIDENCE—HEARSAY—INSURANCE—DEFENSE OF SUICIDE.
   In an action on an insurance policy, in which the defense was suicide, and it was claimed that deceased had been short in accounts with his principal, who had discovered the discrepancy, testimony as to facts and amounts learned by a witness from persons who had paid money to deceased was hearsay and correctly excluded.

2. SAME—EXECUTION OF WRITTEN INSTRUMENTS—POLICY OF LIFE INSURANCE—STATUTES.
   The policy of life insurance issued by the Fraternal Aid Association was admissible in evidence without proof of its execution, in an action against the General Council of the Fraternal Aid Association, which appeared as party defendant,

and did not deny the execution of the certificate under oath, as required by Circuit Court Rule 8, where a copy of the policy was annexed to plaintiff's declaration, and no plea in abatement setting up the correct name of defendant was filed. 3 Comp. Laws, § 10473.

3. TRIAL—SPECIAL QUESTIONS—JURY—INSURANCE.

It was not error to refuse to submit to the jury, as not controlling, three special questions; whether deceased had certain checks protested, whether he had collected moneys for his principal and was unable to pay them, and whether he wrote a letter to his son, as certain witnesses testified, relating to his death: the jury having found, in answer to another question, that the insured did not commit suicide.

4. SAME—WITNESSES—REMARKS OF COUNSEL.

Prejudicial error was not committed by plaintiff's attorneys charging a witness with making false statements during the progress of cross-examination, in view of the prompt interference and correction by the court of counsel.

5. SAME—SAVING QUESTIONS FOR REVIEW.

The court, on appeal, will not pass upon alleged improper argument which the attorney denied making, which the court did not hear, and which was not taken down by the stenographer.

6. SAME.

Nor will it reverse the judgment because plaintiff's attorney, in arguing the case, said, "Your verdict will be mine; but I believe as I stand here today and the man that cannot raise his voice himself, but sleeps over in the little churchyard yonder, has a right by his weeping wife, his widow, to ask you, to ask you, gentlemen, to render under your oath a righteous verdict and give us," etc.

Error to Berrien; Coolidge, J. Submitted June 27, 1911. (Docket No. 106.) Decided October 2, 1911.

Assumpsit by Ella L. Grimme against the General Council of the Fraternal Aid Association on a benefit certificate. Judgment for plaintiff. Defendant brings error. Affirmed.

*Cady & Andrews*, for appellant.

*John J. Sterling*, for appellee.

MOORE, J.  The plaintiff is the widow of Gustav C. Grimme.  There was issued to him, January 28, 1909, an insurance policy.  Mrs. Grimme was named as the beneficiary therein.  Mr. Grimme died November 2, 1909.  The insurance company declined to pay the policy.  Plaintiff commenced suit by declaration upon the policy, and attached thereto a copy of the policy, with notice to appear and plead.  The defendant pleaded the general issue, and gave notice thereunder that deceased committed suicide, thus relieving the insurance company of any liability. The case was tried before a jury, which returned a verdict in favor of the plaintiff.  This verdict was set aside by the trial judge.  A new trial was had, and the jury again returned a verdict in favor of the plaintiff.  A motion was again made for a new trial, which motion was overruled.  The case is brought here by writ of error.

Five requests to charge were offered on the part of counsel for defendant; four of them asked for a directed verdict. The last one reads as follows:

" You are instructed that it has not been sufficiently established that the contents of the bottle analyzed by Dr. Tutton are a part of the contents of the bottle found by Dr. Mitchell in the room of the deceased, and that you should disregard any testimony in regard to the contents of the bottle produced in court."

Each of these requests was refused, and the court charged the jury as follows:

"Gentlemen of the Jury:  The contract of insurance in this case, between Mr. Grimme and the Fraternal Aid Association, provides that if Mr. Grimme should commit suicide within two years from the time he became a member there could be no recovery on the policy of insurance. Mr. Grimme's death occurred less than two years subsequent to his becoming a member.  The company claim that he committed suicide.  If he did, the plaintiff cannot recover.  It devolves upon the defendant in this case, by a preponderance of the evidence, to show this fact.  If the defendant has established this fact, it becomes your duty under the law to render a verdict for the defendant. You should examine the testimony upon this point care-

fully, and not allow any sympathy for the plaintiff or any prejudice against the defendant to override your calm judgment. The defendant is entitled to have a fair trial.

"By suicide is meant the intentional killing of one by himself. If the killing was accidental, the plaintiff is entitled to recover. If Grimme was insane and killed himself intentionally, the plaintiff cannot recover, although Grimme did not comprehend the moral consequence of his act. By the terms of the policy, it is immaterial whether Grimme was sane or insane, if suicide was actually committed. The policy contemplates any suicide, whether done by a sane or insane person. Many people think that any person who commits suicide is insane, and that in these cases mutual benefit associations should be so organized as to pay an insurance policy, even where the principal committed suicide when insane.

"Now, this question does not enter into this case, whether Mr. Grimme was insane or not, because the application and policy and the constitution and by-laws provide that if suicide shall be committed within two years by the principal, whether sane or insane, there can be no recovery. I speak of this because you should keep in mind the rights of the defendant in this contract. So far as the real issue is concerned, whether Mr. Grimme committed suicide, I express no opinion whatever. That is purely a question of fact for you to determine under the evidence in the case. The defendant in this case, in order to establish their theory of suicide, present four lines of testimony: *First.* The company claims that a motive existed on the part of Grimme for committing suicide. *Second.* That Grimme committed suicide by taking poison. *Third.* That the circumstances surrounding the death of Grimme tend to support the theory of suicide. *Fourth.* That letters and declarations on the part of Grimme indicated an intent and design to take his own life. The whole case hinges around these claims of the defendant.

"The defendant seeks to establish a motive for committing suicide. In all cases where an offense or wrong is alleged to have been committed, the question of motive is important. The claim of the defendant is that the fear of exposure, disgrace, and punishment growing out of the discovery of his shortage and transactions with the Singer Sewing Machine Company was the motive which prompted Grimme to commit suicide. These questions arise in this

connection: *First.* Was there a shortage? *Second.*
What did Grimme say about it? *Third.* Did he indicate
by what he said that there was a shortage, and that he
feared the disgrace or punishment which might follow an
exposure? The plaintiff claims that there is no sufficient
evidence of these facts. The defendant claims that there
is. If the defendant has established a sufficient motive
for suicide, it has established an important fact; not nec-
essarily conclusive, however. If other established facts
tend to support the theory of suicide, the proof of motive
would be a very strong fact. If no motive is established,
an important element of the defense would be lacking.
The theory set up by the defense is that Mr. Grimme
killed himself by taking poison, and that the poison was
strychnine. The plaintiff's counsel say that it is not estab-
lished that strychnine was taken by Grimme. Whether
strychnine or not was taken is an important question for
you to determine. Whether Dr. Mitchell made a true
analysis and ascertained correctly that the bottle con-
tained strychnine is an important question. If, however,
from all the facts and circumstances, you find that Grimme
committed suicide by taking poison, you can find for the
defendant, although you may not be able to decide that
the specific poison was strychnine. Under the evidence
in this case, however, it is a very important and critical
question whether Grimme took strychnine or not, because
it is claimed here by the defense in this case that the par-
ticular poison which Mr. Grimme took was strychnine,
and nothing else. That, therefore, the question as to
whether Mr. Grimme actually took strychnine under the
evidence in this case, and under the theory and claims
of the defendant, is a very important question.

"The defendant claims that he has established the fact
that Grimme did not die from natural causes, but from
self-destruction. The plaintiff claims that he died from
disease or natural causes, and that there is no sufficient
evidence of death from any other cause.

"The testimony as to the contents of the bottle is im-
portant. Dr. Mitchell testifies that he was summoned to
the Grimme home the morning of his death, and that he
arrived shortly after the death of Grimme; that some
member of the family handed him a bottle labeled
'strychnine;' that he tested the contents by diluting them
and tasting, and found they were strychnine. The plain-
tiff claims this bottle was handed to Mr. Cunningham;

that Cunningham handed the bottle to Dr. Tutton, and that Dr. Tutton analyzed the contents and ascertained there was no strychnine therein. Dr. Tutton does not say what the article was, but he says it was not strychnine. There is no controversy over the analysis of Dr. Tutton; the real question in this connection is whether the article analyzed is the same, by Dr. Tutton, the same article tested by Dr. Mitchell. Dr. Mitchell testifies that the bottle produced in court contains a larger quantity of liquid than the one he analyzed. If his analysis was correct, the bottle or the contents have been changed, either by accident or design, if the doctor be correct. The circumstances surrounding the case and the analysis by the doctor are important facts for you to take into consideration as bearing upon the question whether Grimme took strychnine. If Dr. Mitchell was wrong in his analysis, then the evidence that strychnine was used falls to the ground.

"The defendant claims that the declarations made to the agent of the sewing machine company, and the circumstances surrounding his death, the acts and conduct of Grimme the night of his death, the appearance of his body, indicated a design to commit suicide, and that he followed it up by suicide through the taking of poison.

"It is claimed by the plaintiff that Dr. Mitchell's testimony is not credible; that Grimme's body after death was natural in appearance, and that the evidence is insufficient to show that Grimme's declarations actually meant that he intended to take his life. You should carefully scrutinize the evidence on this point. If the defendant has established the fact that Grimme made declarations showing a design to take life, that fact is an important fact to take into consideration. The strength of the defense depends upon whether a chain of circumstances has been established from which you can reasonably infer by a preponderance of the evidence that Grimme committed suicide. Plaintiff's counsel claim that no such chain of circumstances has been established by a preponderance of the evidence. The defendant's counsel claim that it has. The defendant also claims that certain letters were written by Grimme, one of which was addressed to Clarence Grimme, and read by two witnesses, and that the letter to Clarence indicated a design to take life, and the reasons for it. The plaintiff claims that the testimony—that is, the language in those letters—is doubtful and weak; that

the witnesses cannot recollect the exact language contained in the letters, and that there is no sufficient proof that the letters were actually written by Grimme. If the letters were written by Grimme, if they contain the language testified to by the witnesses for defendant, then those facts are important for your consideration, as bearing upon the question as to whether Grimme intended to commit suicide. If you do not find the language contained in those letters (providing they were written) indicated a design to commit suicide, then those letters should be rejected, as having no weight whatever in the case.

" It has been said here that it devolves upon the defendant to prove the defense by a preponderance of the evidence. By preponderance is simply meant a little more evidence in weight in character and credibility than that of the other side. Now this case is a very important one, and you should scrutinize the testimony carefully, and not be affected by any sympathy or by any prejudice one way or the other, and endeavor to arrive at a just result from the evidence in the case.

"All my design has been simply to point out to you the law which should govern your deliberations, and to point out the claims made by the respective parties; that is, by counsel for plaintiff and by counsel for defendant. In case you find for the plaintiff in this case, your verdict will be for $700, with interest at 5 per cent. for nine months. I figured that up; $26.25 that would be; so if you find for the plaintiff your verdict will be for $726.25. Of course, if you find that Mr. Grimme committed suicide as claimed by the defendant, you will find a verdict for the defendant, or no cause of action."

Four special questions were prepared by counsel to be submitted to the jury:

(1) Did the deceased, Gustav C. Grimme, commit suicide?

(2) At the time of the death of Gustav C. Grimme, did he have one or more of his checks protested for nonpayment?

(3) At the time of his death, had Gustav C. Grimme collected moneys due the Singer Sewing Machine Company which he was unable to pay?

(4) Did Gustav C. Grimme, just prior to his death, write and sign the letter addressed to his son, Clarence, as shown by defendant's witnesses?

The first and third were submitted to the jury, but the third one was later withdrawn by the court. The second and fourth the court declined to submit to the jury. The first one, "Did the deceased, Gustav C. Grimme, commit suicide?" was answered by the jury, "No."

Counsel first argue a group of alleged errors growing out of the rejection of certain testimony of Mr. Johnson, the managing salesman of the Singer Sewing Machine Company, for which company the deceased was an agent. Mr. Johnson was allowed to give a telephone conversation with the deceased, in which he claims deceased admitted a shortage in his accounts and expressed the hope that the company would not have him arrested.

"He said: 'Now, you are not going to be—to push this thing against me; you are not going to have me arrested or make me any serious trouble on this?' He said: 'I wouldn't stand for the disgrace of it.' He said: 'You know my family, and I wouldn't disgrace them; if I thought you were going to be harsh with me, I would make way with myself; I never would stand for it.' I answered him I thought we could fix it up some way if I could talk with him, and I would come and talk matters over."

The witness testified that in this conversation neither of them mentioned the amount of the shortage. It was attempted to show orally what the witness afterwards found out as to the shortage by interviewing customers of the deceased, and other investigations he made. The record shows the following:

"*The Court:* This man can't tell the amount, only what somebody else told him. He had to go and see the parties who paid Mr. Grimme, and it is hearsay. All he can testify is what they told him.

"*The Court:* Why do you not produce your books?

"*Mr. Andrews:* Because there are no books to produce on that. This man went to those people, and found them and talked and ascertained and investigated the amount, and there is absolutely no book and no item and no history of that affair, except what he gained from that investigation himself. And this jury should know.

"*The Court:* I never heard of such testimony offered before. It is hearsay. The only way is to get the men who paid Mr. Grimme. He has no personal knowledge of the thing himself. You can bring in the books, and if you have no books you have got to produce the men who paid the money to Mr. Grimme. That is the testimony going to show shortage; but this witness cannot know anything about that only by hearsay. I never heard such a proposition before."

We think all this line of testimony was clearly incompetent. We have noticed what is said about the exclusion of a question put to Myrtle Grimme, and content ourselves with saying it was not error.

We now quote from brief of counsel:

"The court was in error in allowing plaintiff to introduce in evidence policy of insurance issued by General Council of the Fraternal Aid Association to Gustav C. Grimme, and denying the motion to strike the same from the record; also to the introduction of certain letters written to the Fraternal Aid Association, in that they were not addressed to the defendant named in the declaration. Also to the refusal to grant defendant's request No. 4."

As before stated, a copy of the certificate of insurance was attached to the declaration. No plea of abatement was interposed. The plea of the general issue was entered, with notice that the defense would be the suicide of the insured. See section 10473, 3 Comp. Laws. No affidavit was filed and served at the time defendant pleaded, or any other time, denying the execution of the policy attached to plaintiff's declaration. Under this situation, no proof of its execution was required, and its execution as alleged was admitted. Circuit Court Rule 8; *Clay, etc., Ins. Co.* v. *Manufacturing Co.*, 31 Mich. 346; *Simon* v. *Insurance Co.*, 58 Mich. 278 (25 N.W. 190); *Lorscher* v. *Knights of Honor*, 72 Mich. 316 (40 N. W. 545, 2 L. R. A. 206); *Miller* v. *Insurance Co.*, 158 Mich. 402 (122 N. W. 1093).

Was the action of the court in relation to the special questions error? The provisions of the statute are found

in section 10237, 3 Comp. Laws. No one of the questions proposed, except the first one, was controlling. If the insured committed suicide, that made a complete defense. If he did not commit suicide, the insurer was liable. These results could not be changed by any answer that might be given to the other questions. See *Cousins* v. *Railway Co.*, 96 Mich. 386 (56 N. W. 14), and the cases there cited.

Error is assigned in relation to the examination of the witness Dr. Mitchell. The record shows the following:

"Recross-examination by Mr. Sterling:

"*Q.* You knew that there would be a contest over this insurance, did you not?

"*A.* I didn't ever dream of any such thing. I didn't suppose there was a lawyer would ever take it up.

"*Q.* You didn't.

"*A.* No, sir; not at all.

"*Q.* Didn't think a lawyer would ever take it up?

"*A.* No, sir.

"*Mr. Sterling:* I never thought there was a physician would falsify about a material fact, either.

"*Mr. Andrews:* I take exception to that, and I say—

"*The Court* (interrupting): In the first place, the witness ought not to have made that remark; but the attorney knows the usages of courts and ought not to have made that remark. Both of you are to blame. The witness should not make any remark about lawyers in that sense.

"*Q.* You have not any interest in this case at all, have you?

"*A.* None whatever."

The witness invited what occurred, and while counsel ought not to have responded as he did we think the court took care of the occurrence.

Error is assigned upon the argument of counsel. He at once disclaimed having made the argument with which counsel charged him. The judge said he did not hear him make it, and the stenographer did not take the argument. Under such a situation, we cannot pass upon the question.

Error is assigned because of the following:

"I thank you for so patiently listening to me tonight; it is a late hour. I know you feel perhaps I have indulged longer than I should. I would like you to take these things as you find them. Your verdict will be mine; but I believe as I stand here today, and the man that cannot raise his voice himself, but sleeps over in the little churchyard yonder, has a right by his weeping wife, his widow, to ask you, to ask you, gentlemen, to render under your oath a righteous verdict, and give us $700, with proper interest.

"*Mr. Andrews:* I take exception to the last remarks of counsel, appealing to the sympathy and prejudice of the jury."

Some latitude must be left to the zeal of counsel, and, while we do not commend this language, we are not prepared to say that because of this peroration the case should be reversed.

Error is assigned because a new trial was denied. It is said the verdict is against the weight of evidence, and for that reason a new trial should have been granted. The important question in the case was whether the insured committed suicide. The evidence bearing upon that issue was conflicting and presented a question for the jury under proper instructions, which were given.

The other assignments of error have been examined, but we deem it unnecessary to discuss them. No one can read this record without reaching the conclusion that counsel on both sides, and some of the witnesses, were very zealous. As to the counsel, the honors were about even in that respect. As to the witnesses, there was a sharp conflict in their testimony. The trial court had a very difficult task to so direct the trial as to avoid reversible error. We think he accomplished that result.

Judgment is affirmed.

OSTRANDER, C. J., and BIRD, BLAIR, and STONE, JJ., concurred.